1

2

3

4

5              UNITED STATES DISTRICT COURT

6            EASTERN DISTRICT OF WASHINGTON

7  UNITED STATES OF AMERICA,

8                          Plaintiff,        NO:  1:14-CV-3162-RMP

                                             ORDER REGARDING UNITED
9        v.                                  STATES' MOTION TO DISMISS,
                                             MOTION FOR SUMMARY
10 KING MOUNTAIN TOBACCO                     JUDGMENT, MOTION TO STRIKE
   COMPANY, INC.,                            REPLY BRIEF, AND MOTION TO
                                             STRIKE JURY DEMAND; AND
11                        Defendant.         KING MOUNTAIN'S MOTIONS FOR
12                                           DISCOVERY

13        BEFORE THE COURT are four motions filed by the United States:  a

14 Motion for Summary Judgment, **ECF No. 15**; a Motion to Dismiss Counterclaim,

15 **ECF No. 14**; a Motion to Strike Jury Demand, **ECF No. 22**; and a Motion to Strike

16 Reply Memorandum, **ECF No. 37**.  Also before the Court are two motions for

17 discovery filed by King Mountain Tobacco Co., Inc.:  a Rule 56(d) Motion in

18 Opposition to United States of America's Motion for Summary Judgment, **ECF**

19 **No. 23**; and a Motion in Support of Defendant's Essential Right to Conduct

20 Discovery, **ECF No. 25**.  The Court heard oral argument on the motions on June

ORDER REGARDING VARIOUS MOTIONS ~ 1

18, 2015.  Trial Attorney Kenneth Sealls appeared on behalf of the United States, and Randolph Barnhouse appeared on behalf of King Mountain.  The Court has reviewed the motions, considered the parties' arguments, and is fully informed.

## BACKGROUND

**A.    Factual Background**

On October 30, 2014, the United States, on behalf of the Commodity Credit Corporation ("CCC") of the United States Department of Agriculture ("USDA"), filed a complaint against King Mountain Tobacco Co., Inc. ("King Mountain") to recover unpaid assessments mandated by the Fair and Equitable Tobacco Reform Act of 2004, codified at 7 U.S.C. §§ 518-519a ("FETRA").  ECF No. 1 at 1-2.  FETRA provided for tobacco farmers to receive annual payments over a period of ten years, for fiscal years 2005 – 2014, from the Secretary of Agriculture ("Secretary"), "in exchange for the termination of tobacco marketing quotas and related price support."  § 518a(a); *see* §§ 518a, 518b*; FETRA, Pub. L. No. 108-357, secs. 611, 612, 118 Stat. 1418 (terminating the Federal Tobacco Quota and Price Support programs).

To fund these payments, FETRA directed the Secretary to impose quarterly assessments during the same time period on tobacco product manufacturers and importers.  § 518d(b).  The Secretary determined the amount of each manufacturer's quarterly assessment by first calculating the amount necessary to

cover all contract payments for the quarter, then allocating that amount among six classes of tobacco products, and then dividing each class's portion among the manufacturers and importers of that product class based on their respective market share of gross domestic volume.  §§ 518d(b)(2), (c), (e), (f).

After calculating a manufacturer's assessment for a given quarter, FETRA required the Secretary to notify the manufacturer of the amount to be assessed at least thirty days before the payment date.  § 518d(d)(1).  If a manufacturer wished to "contest an assessment," it could do so by notifying the Secretary within thirty days after receiving the assessment notification.  § 518d(i)(1).  Specifically, 7 C.F.R. § 1463.11 required a manufacturer to submit a written statement setting forth the basis of the dispute to the Executive Vice President of CCC.  7 C.F.R. § 1463.11(a).

The Executive Vice President would then assign a person to act as the hearing officer on behalf of CCC to develop an administrative record that would provide the Executive Vice President with sufficient information to render a final determination on the matter in dispute.  § 1463.11(b).  The agency could revise an assessment if the manufacturer successfully established that the "initial determination of the amount of an assessment [was] incorrect."  7 U.S.C. § 518d(i)(3).  Any manufacturer who was "aggrieved by a determination of the

1   Secretary with respect to the amount of any assessment" could seek judicial review

2   of the Secretary's determination.  7 U.S.C. § 518d(j)(1); 7 C.F.R. § 1463.11(d).

3         The administrative record in this case contains the quarterly assessment

4   notifications, or invoices, that CCC sent to King Mountain between June 1, 2007,

5   and December 1, 2014.  ECF No. 16.  CCC sent King Mountain two invoices for

6   each quarter:  one based on King Mountain's manufacture of cigarettes and one

7   based on its manufacture of roll your own tobacco.  Each invoice stated the class of

8   tobacco product for which it applied and the total assessment owed by King

9   Mountain for that product.  ECF No. 16.

10         Additionally, each invoice provided the information necessary to understand

11   how the assessment amount was calculated:  the total amount of money that CCC

12   needed to collect that quarter to fully fund its annual payments to tobacco farmers;

13   the percentage of sales in each product class; the proportionate amount of money

14   that CCC needed to collect for each product class; the total amount of taxes paid by

15   all tobacco manufacturers on the product class to which the invoice pertained; the

16   amount of taxes that King Mountain paid on the product class to which the invoice

17   pertained; King Mountain's percentage of the total amount of paid taxes on the

18   applicable product class; and finally, the amount of King Mountain's total

19   quarterly assessment, calculated by multiplying King Mountain's "share," or

20

1  percentage of total taxes paid in that product class, by the total amount of money

2  that CCC needed to collect on that class.  ECF No. 16.

3      The administrative record indicates that, on numerous occasions, King

4  Mountain either only partially paid a quarterly assessment or neglected to pay the

5  assessment entirely.  ECF No. 16.  The United States notes that King Mountain

6  made fourteen payments on the assessments between June 2007 and September

7  2010.  ECF No. 15 at 6.  Since September 2010, King Mountain has not made any

8  payments.  ECF No. 15 at 6; ECF No. 16.  USDA sent King Mountain thirty

9  separate demand letters between July 15, 2009, and November 15, 2014.  ECF No.

10  16.  During that time, King Mountain's alleged owed balance increased from

11  $472,794.22 to $6,373,275.29.  ECF No. 16.

12      The record also shows that King Mountain objected to the assessments on

13  several occasions.  In February of 2012, King Mountain contacted the Receivable

14  Management Office ("RMO") of the Farm Service Agency ("FSA") within USDA

15  and informed Judy Curtis, an RMO employee and the point of contact listed on the

16  demand letters, that King Mountain was disputing its assessment.  ECF No. 16,

17  KM-AR-000101.  The outcome of that contact is unclear.

18      On March 15, 2012, King Mountain's counsel contacted FSA again to

19  dispute the assessments.  ECF No. 16, KM-AR-000189.  In a follow-up e-mail to

20  another FSA employee, Julianna Young, King Mountain disputed that it owed

ORDER REGARDING VARIOUS MOTIONS ~ 5

1    $1,519,547.71, confirmed that King Mountain's counsel's telephone conversation

2    with Ms. Young qualified as notice of appeal as required under the statute, and

3    informed FSA that to the extent the assessments were predicated on taxes owed by

4    King Mountain, King Mountain was currently in litigation disputing those tax

5    assessments.  ECF No. 16, KM-AR-000189.  Ms. Young did not respond to King

6    Mountain's e-mail until eleven days later, at which time she stated that her

7    "supervisor is coordinating with our [Tobacco Transition Assistance Program]

8    folks," and she believed that "at some point some guidance will come back to

9    [her]."  ECF No. 16, KM-AR-000189.  There is no evidence in the record that Ms.

10   Young or any other FSA employee reengaged King Mountain on the issue.

11       Subsequently, it appears that counsel for King Mountain and Ms. Young had

12   a telephone conversation on July 6, 2012, in which King Mountain demanded the

13   return of $75,000 which the Bureau of Alcohol, Tobacco, Firearms and Explosives

14   had agreed to give King Mountain as part of a settlement agreement in a separate

15   excise tax case, but which FSA confiscated and applied as an "offset" to King

16   Mountain's unpaid FETRA assessments.  ECF No. 16, KM-AR-000098.  Ms.

17   Young allegedly informed King Mountain for the first time that assessment

18   disputes should be directed to Jane Reed.  ECF No. 16, KM-AR-000099.  King

19   Mountain objected to never having been directed to contact Jane Reed previously,

20   and reminded Ms. Young of her representation that the March telephone

conversation constituted sufficient notice of intent to dispute the assessments.  ECF No. 16, KM-AR-000099.

Larry Durant, Chief of RMO, responded by e-mail on July 12, 2012, to King Mountain's letter dated July 9, 2012.  He did not address King Mountain's objection to the assessments, stating only that the "Receivable Management Office does not handle dispute request [sic]."  ECF No. 16, KM-AR-000101.  Mr. Durant stated that the $75,000 confiscation was "in compliance with DCIA regulations," and refused to return the funds to King Mountain.  ECF No. 16, KM-AR-000101.

King Mountain responded to Mr. Durant on August 7, 2012.  ECF No. 16, KM-AR-000103.  King Mountain reiterated its position that the confiscation was wrongful, that FSA had failed to adequately inform King Mountain of available administrative remedies, and that the outcome of King Mountain's litigation against the Bureau of Alcohol, Tobacco, Firearms and Explosives would directly affect the validity of the assessments.  ECF No. 16, KM-AR-000103.

On September 17, 2012, King Mountain mailed an appeal letter to CCC and the Economic and Policy Analysis Staff ("EPAS") of FSA, disputing the Notice of Acceleration or Revision letter, dated August 16, 2012, which asserted that King Mountain owed $3,033,625.80 under the Tobacco Transition Assessment Program ("TTAP") and informed King Mountain that amount would be placed in DOJ litigation status.  ECF No. 16, KM-AR-000104.  King Mountain also requested a

1    hearing before CCC.  ECF No. 16, KM-AR-000104.  King Mountain argued that

2    the Yakama Treaty of 1855 prohibited the assessments on King Mountain's

3    tobacco products and requested that "all payments made under TTAP assessments

4    be returned to it, as well as funds illegally offset by the [FSA]."  ECF No. 16, KM-

5    AR-000106.  Additionally, King Mountain disputed the offset because it received

6    no notice of the offset action or any information regarding when it occurred.  ECF

7    No. 16, KM-AR-000107.

8            Juan Garcia, the Executive Vice President of CCC, responded to King

9    Mountain's appeal letter on October 12, 2012.  ECF No. 16, KM-AR-000108.  Mr.

10   Garcia informed King Mountain that "appeal rights for that issue extend only to

11   contesting the accuracy of the amount of the debt due," and that appeal rights

12   pertaining to any previous quarterly assessment had "expired long ago."  ECF No.

13   16, KM-AR-000108.  Mr. Garcia determined that the total amount of debt owed

14   had been accurately calculated, and therefore denied King Mountain's appeal.

15   ECF No. 16, KM-AR-000108.  Mr. Garcia noted that King Mountain had

16   requested an in-person administrative hearing, but denied the request as untimely.

17   ECF No. 16, KM-AR-000108.  Finally, Mr. Garcia stated that "the assessments

18   related to this appeal are administratively final," and reiterated:  "This is the final

19   administrative decision with regard to this appeal."  ECF No. 16, KM-AR-000108.

20

1    King Mountain mailed and e-mailed a second notice of appeal to EPAS on

2  April 10, 2013, contesting the assessments appearing on invoices dated March 1,

3  2013.  ECF No. 16, KM-AR-000110.  King Mountain raised the same arguments

4  in objection to the assessments and the offset action.  ECF No. 16, KM-AR-

5  000110.  This time King Mountain attached several supporting documents,

6  including the Treaty of 1855 and King Mountain's complaint to enforce its treaty

7  rights filed against the Alcohol and Tobacco Tax and Trade Bureau.  ECF No. 16,

8  KM-AR-000110.  The United States admits that FSA did not respond to King

9  Mountain's second letter of appeal.  ECF No. 33 at 7.

10    The United States alleges that King Mountain's outstanding balance totals

11  $6,372,209.67, including late payment interest, and seeks a judgment in its favor

12  for the outstanding balance as well as any "assessments, interest, and/or reporting

13  penalties that have become delinquent since September 2014, and that do become

14  delinquent pending the resolution of this action, and interest from the date of the

15  judgment . . . ."  ECF No. 1 at 5.

16    King Mountain filed an answer and counterclaim seeking a declaratory

17  judgment that imposing FETRA assessments on King Mountain violates the 1855

18  Yakama Treaty and is therefore prohibited.  ECF No. 10.[1]  King Mountain also

---

19  [1] Although King Mountain also pleaded in its answer that the FETRA assessments

20  violate the Constitution and the General Allotment Act, King Mountain has not

ORDER REGARDING VARIOUS MOTIONS ~ 9

seeks a refund of all assessments paid and an abatement of any assessment

payments still due.  ECF No. 10.

**B.    Legal Posture**

   *i.  Administrative Procedure Act*

   There are several threshold issues before the Court.  First, the Court must

determine whether the Administrative Procedure Act ("APA") applies to the

Court's review in this case.  The United States contends that this case requires

"judicial review of agency action" under FETRA, subject to the Administrative

Procedure Act ("APA").  ECF No. 32 at 2-3.  King Mountain contends that this

---

argued those claims in its responses to the United States' Motion to Dismiss or the

United States' Motion for Summary Judgment.  After the briefing period on the

United States' motions had concluded, King Mountain filed a motion for summary

judgment on its counterclaim, arguing that the FETRA assessments violate the

Takings Clause of the Constitution.  ECF No. 41.  The briefing period for that

motion has not yet concluded.  King Mountain does not argue in that motion that

the FETRA assessments are prohibited under the General Allotment Act.

Accordingly the Court treats the General Allotment Act defense and counterclaim

as having been abandoned.  The Court reserves ruling on the Takings Clause

defense and counterclaim pending completed briefing.

case is "not an administrative appeal.  It is an original action to collect an

assessment."  ECF No. 25 at 1.  King Mountain notes that in its complaint, the

United States made no mention of King Mountain's attempts to contest the

assessments at the agency level, or of the agency's final determination that King

Mountain's assessments were accurately calculated.  ECF No. 25 at 4.  Therefore,

King Mountain argues, the APA does not apply to this case.  ECF No. 25 at 4.

Additionally, King Mountain argues that FETRA provides a right of judicial

review to an aggrieved party, not the government.  ECF No. 25 at 4-5.

The APA provides a right of review to a "person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute . . . ."  5 U.S.C. § 702.  This provision

applies unless the relevant statute precludes judicial review, or by law, agency

action is committed to agency discretion.  § 701(a).  The APA defines "person" as

"an individual, partnership, corporation, association, or public or private

organization other than an agency."  § 551(2).

FETRA and the implementing Code of Federal Regulations provide for

judicial review of adverse agency determinations.  7 U.S.C. § 518d(i); 7 C.F.R. §

1463.11(d).  Thus, under the plain language of the APA, the APA would apply had

King Mountain, a person under the APA, sought judicial review of FSA's final

determination that the assessments imposed against it were accurate.  *See Prime*

1  *Time Int'l Co. v. Vilsack*, 599 F.3d 678, 686 (D.C. Cir. 2010) ( "USDA's

2  determination of [the manufacturer's] assessments for three quarters of FY 2005

3  was an adjudication, attendant to which [the manufacturer] had rights to an

4  administrative appeal and judicial review.") (citing the APA, 5 U.S.C. § 551(7)).

5       The question is whether the APA also applies in this case where the agency

6  has filed suit against King Mountain to recover the unpaid assessments.  The Fifth

7  Circuit Court of Appeals held that "[t]he fact that this suit is one brought by the

8  government for judicial enforcement rather than one brought by a citizen to

9  challenge agency action, does not mean that judicial review of the agency's action

10  in this suit is not pursuant to the APA."  *United States v. Menendez*, 48 F.3d 1401,

11  1410 (5th Cir. 1995).

12       Similarly, the Ninth Circuit has applied the APA to a defendant's affirmative

13  defense raised in a criminal proceeding brought by the government, as well as to a

14  defendant's counterclaim in a civil ejectment suit brought by the United States.

15  *United States v. Backlund*, 689 F.3d 986, 999-1001 (9th Cir. 2012); *Coleman v.*

16  *United States*, 363 F.2d 190, 196 (9th Cir. 1966), *rev'd on unrelated grounds*, 390

17  U.S. 599 (1968).  Reason compels this result because a court's failure to apply the

18  APA would incentivize parties not to pursue the administrative appeal process in

19  favor of judicial review, and thus undercut legislative intent to establish that

20  process.  *See Backlund*, 689 F.3d at, 999-1001 (reasoning that "parties may not use

ORDER REGARDING VARIOUS MOTIONS ~ 12

a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions.").

Regardless of whether the United States or King Mountain initiated this suit, the APA applies and outlines the scope of the Court's review, because the imposition of FETRA assessments on King Mountain was appealable at the administrative level. King Mountain has raised several affirmative defenses to CCC's collection action, and it has filed a counterclaim against CCC. ECF No. 10. *Backlund* and *Coleman* apply and mandate that the APA applies to this action.

ii.    *Exhaustion and Remand*

Having determined that the APA applies to this action, the Court considers whether King Mountain adequately exhausted its administrative remedies.

The APA permits judicial review of a "final agency action for which there is no other adequate remedy in a court" 5 U.S.C. § 704. "A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented . . . ." *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979) (quoting *Unemployment Comp. Commc'n of Territory of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)) (internal quotation marks omitted). "Thus, absent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time." *Getty Oil*, 607 F.2d at 256. The doctrine of exhaustion serves many

1    purposes, including enabling the agency to "function efficiently and so that it may

2    have the opportunity to correct its own errors, to afford the parties and the courts

3    the benefit of its experience and expertise, and to compile a record which is

4    adequate for judicial review." *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975).

5        However, the doctrine of exhaustion is "not designed to extinguish claims

6    which, although not comprehensively or artfully presented in the early stages of the

7    administrative process, are presented fully before the process ends." *Getty Oil*, 607

8    F.2d at 256.  "It is the imposition of an obligation or the fixing of a legal

9    relationship that is the indicium of finality of the administrative process." *Id.*

10    "[W]here a claim is fully presented before the administrative process ends, the

11    doctrines of exhaustion and waiver are not applicable." *Abel v. Dir., Office of*

12    *Workers Comp. Programs*, 939 F.2d 819, 821 (9th Cir. 1991).

13        The United States argues that King Mountain failed to exhaust its

14    administrative remedies with regard to all but two quarterly assessments because it

15    did not file an appeal every quarter during the entire assessment period.  ECF No.

16    15 at 10.  King Mountain argues that the imposition of any FETRA assessment

17    against it violates the 1855 Yakama Treaty.  ECF No. 10.  King Mountain also

18    argues that the assessment calculations are likely inaccurate because they do not

19    account for unreported cigarette production by other manufacturers.  ECF No. 10

20    at 5; ECF No. 24 at 13-14; ECF No. 23 at 3-4.

ORDER REGARDING VARIOUS MOTIONS ~ 14

1    King Mountain's argument regarding the Yakama Treaty need not have been

2   exhausted because CCC did not have authority to consider issues of treaty law.

3   The Supreme Court has stated that "[i]f treaties are to be given effect as federal law

4   under our legal system, determining their meaning as a matter of federal law is

5   emphatically the province and duty of our judicial department . . . ." *Sanchez-*

6   *Llamas v. Oregon*, 548 U.S. 331, 353-54 (2006) (citation and internal quotation

7   marks omitted).  Similarly, the Ninth Circuit has held that "challenges to the

8   constitutionality of a statute or a regulation promulgated by an agency are beyond

9   the power or the jurisdiction of the agency," and need not be exhausted.  *Gilbert v.*

10   *Nat'l Transp. Safety Bd.*, 80 F.3d 364, 366-67 (9th Cir. 1996); *see McCarthy v.*

11   *Madigan*, 503 U.S. 140, 147 (1992), *superseded by statute on unrelated grounds*.

12    In response to King Mountain's first appeal to the Executive Vice President

13   of CCC, Mr. Garcia informed King Mountain that "appeal rights for that issue

14   extend only to contesting the accuracy of the amount of the debt due."  ECF No.

15   16, KM-AR-000108.  Therefore, it appears that the agency limited its review to the

16   accuracy of assessment calculations and debt owed.  Additionally, the United

17   States conceded during oral argument that the agency could not have considered

18   King Mountain's treaty claim at all.  Therefore, the Court finds that King Mountain

19   need not have exhausted its claim regarding whether it is exempt from the

20   assessments under the Yakama Treaty, and the Court properly considers that

ORDER REGARDING VARIOUS MOTIONS ~ 15

1    argument in the first instance, *infra,* as it pertains to all of the assessments imposed

2    against King Mountain.

3        Regarding King Mountain's second contention that the FETRA assessments

4    may be improperly calculated, King Mountain argues that it was denied the right to

5    administratively appeal its FETRA assessments because "USDA completely

6    faltered and miscommunicated with King Mountain during the administrative

7    appeal process." ECF No. 26 at 17.  King Mountain filed at least two formal

8    appeals.  In both appeal letters, King Mountain requested a hearing pursuant to 7

9    C.F.R. § 1463.11.  It appears that CCC construed King Mountain's first appeal

10   letter as an appeal of King Mountain's total debt owed, rather than as an appeal of

11   the most recent assessment.  KM-AR-000108 ("Your current appeal is predicated

12   on an August 16, 2012, Notice of Acceleration or Reversion letter.").  Accordingly,

13   the agency denied King Mountain's request for a hearing as irrelevant to the

14   question of whether King Mountain's total unpaid assessments equaled the amount

15   of debt allegedly owed, and as untimely with regard to the accuracy of each

16   individual assessment comprising the total amount of debt owed.  The agency did

17   not grant King Mountain a hearing to contest the most recent quarterly assessment,

18   nor did it explain why.  CCC never responded to King Mountain's second request

19   for a hearing, despite King Mountain's explicit objection to "the amounts assessed

20

1    dated March 1, 2013 for invoices CG12100004 in the amount of $287,952.29 and

2    RY13100396 in the amount of $280.61."  KM-AR-000110.

3        The United States conceded at oral argument that CCC never held a hearing

4    in response to King Mountain's requests and that King Mountain was denied due

5    process.  Both the United States and King Mountain concur that remand to the

6    agency is the appropriate remedy, to enable the agency to develop properly the

7    administrative record.  Therefore, the Court will remand this case to CCC

8    regarding King Mountain's claims that the assessment calculations are inaccurate

9    if this case survives King Mountain's pending motion for summary judgment,

10   which is not yet ripe.

11       However, the Court must address whether, on remand, King Mountain is

12   entitled to challenge every assessment or only those assessments associated with its

13   first and second appeal letters, as the United States contends.  Although King

14   Mountain's first appeal letter was dated September 13, 2012, KM-AR-000104,

15   King Mountain attempted to contest the assessments as early as February 15, 2012.

16   KM-AR-000101; KM-AR-000189.  It appears from the record that King Mountain

17   repeatedly received inaccurate and inconsistent information regarding how to

18   contest the assessments properly.  In various communications with the agency

19   between February 15, 2012, and April 10, 2013, King Mountain contested a

20   demand letter, a letter notifying King Mountain of debt acceleration, and a

quarterly assessment for March 1, 2013.  Each time, King Mountain contended that all FETRA assessments, past, present, and future, were invalid as applied to it. King Mountain's final letter was sent on April 10, 2013, to which King Mountain never received a response.

The Court finds that King Mountain failed to exhaust its administrative remedies prior to February 2012 because there is no evidence that King Mountain attempted to challenge the assessments prior to that time.  However, beginning in February of 2012, King Mountain attempted to challenge the assessments in some manner, yet was given inconsistent guidance regarding the process.  After April 10, 2013, when King Mountain sent its final appeal letter, any future appeals by King Mountain can be considered futile.  The agency stated on October 12, 2012, in response to King Mountain's first letter of appeal, that King Mountain's appeal rights had expired, and subsequently failed to respond to King Mountain's second appeal at all.  *See McCarthy*, 503 U.S. at 148 ("[A]n administrative remedy may be inadequate where the administrative body . . . has otherwise predetermined the issue before it.").

Therefore, if the Court remands this case as stated, the scope of remand will be limited to a determination of the accuracy of the FETRA assessments imposed against King Mountain in or after February of 2012.

1  **C.    Discovery**

2       *i.    Motion to Strike Reply Brief*

3       King Mountain filed two motions for discovery requesting that the Court

4  order discovery prior to ruling on the United States' motions to dismiss and for

5  summary judgment.  ECF Nos. 23 and 25.  The United States moved to strike King

6  Mountain's reply brief to one of the motions for discovery because it was filed one

7  week late.  ECF No. 37.[2]  Although King Mountain disobeyed the Court's

8  Scheduling Order, the Court prefers to decide the issues on their merits, absent

9  some showing of prejudice to the opposing party.  No prejudice having been found,

10  the Court denied the United States' motion to strike the reply brief.

11       *ii.    Scope of Review*

12       The United States argues that the scope of the Court's review is limited to

13  the administrative record and that no discovery is warranted.  ECF No. 32 at 3.

14  Additionally, the United States notes that this suit was brought pursuant to 15

15  U.S.C. § 714b(c), which gives CCC the power to "sue and be sued," and gives

16  federal district courts "exclusive original jurisdiction . . . of all suits brought by or

17  
_____

18  [2] The Court's scheduling order required King Mountain to file its reply brief to any

19  discovery motion no later than April 17, 2015.  ECF No. 18 at 2.  King Mountain

20  filed one of its reply briefs on April 24, 2015.  ECF No. 36.

1    against the Corporation."  15 U.S.C. § 714b(c).  ECF No. 32 at 3.  The United

2    States argues that because 15 U.S.C. § 714b(c) is "silent about the appropriate

3    standard of review . . . the Court's review is limited to the administrative record."

4    ECF No. 32 at 3 (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715

5    (1963)).

6          King Mountain argues that discovery is warranted on several bases:  (1)

7    without discovery, King Mountain does not have the information it needs to fully

8    and completely present its claims and defenses; (2) the assessment calculations are

9    likely inaccurate because they do not account for unreported cigarette production

10   by other manufacturers, and discovery is likely to produce evidence of this

11   inaccuracy; (3) there is no exception in this case to the general rule requiring

12   discovery because this action is not a review of an administrative appeal but an

13   original action to collect an assessment; and (4) judicial estoppel prevents the

14   United States from arguing against the appropriateness of discovery in this case

15   because the United States previously represented in response to King Mountain's

16   Motion for a More Definite Statement that King Mountain could obtain additional

17   information in discovery.  King Mountain also maintains that the Court previously

18   recognized King Mountain's right to conduct discovery when it denied King

19   Mountain's motion for a more definite statement of the complaint and stated that

20

ORDER REGARDING VARIOUS MOTIONS ~ 20

King Mountain could obtain the additional details it sought through the discovery

process.  ECF No. 25 at 2 (quoting ECF No. 9 at 8).[3]

Judicial review of action by an agency generally is confined to the

administrative record.  *See Camp v. Pitts,* 411 U.S. 138, 142, (per curiam) ("[T]he

focal point for judicial review should be the administrative record already in

existence, not some new record made initially in the reviewing court.").  Thus,

actions for review on an administrative record normally are exempt from initial

disclosures under the Federal Rules of Civil Procedure.  Fed. R. Civ. P.

26(a)(1)(B).  Additionally, the Supreme Court in *Carlo Bianchi* stated that "in

cases where Congress has simply provided for review, without setting forth the

standards to be used or the procedures to be followed, this Court has held that

consideration is to be confined to the administrative record and that no de novo

proceeding may be held."  *Carlo Bianchi*, 373 U.S. at 715

The Court already has determined that this case is subject to the APA.  If the

case survives summary judgment and the Court remands the case to CCC for a

hearing on the accuracy of any assessments imposed after February 2012, no

discovery is warranted in this Court on King Mountain's claim regarding the

---

[3] King Mountain may now obtain this additional information on remand before the

agency.

accuracy of the assessment calculations.  However, the Court will not remand King

Mountain's treaty defense and counterclaim, and that argument need not be limited

to the administrative record because the agency neither had authority to consider

that claim nor addressed it.  Therefore, the Court must decide whether discovery on

King Mountain's treaty claim is warranted on other grounds.

### iii.    Relevance of Discovery

Federal Rule of Civil Procedure 26 states:

> Parties may obtain discovery regarding any nonprivileged matter that
> is relevant to any party's claim or defense . . . .  For good cause, the
> court may order discovery of any matter relevant to the subject matter
> involved in the action.  Relevant information need not be admissible
> at the trial if the discovery appears reasonably calculated to lead to the
> discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Thus, King Mountain is entitled to discovery on its treaty

claim if the discoverable information it seeks is relevant to the treaty counterclaim

or defense.

King Mountain maintains that the Court must permit discovery regarding

"the Yakama people's understanding of the terms" of the 1855 Yakama Treaty,

and then make findings of fact as to whether "the Treaty terms as understood by

the Yakama prevent the imposition of FETRA assessments on King Mountain . . .

."  ECF No. 26 at 6-7.  The United States contends that such discovery is

unnecessary because "King Mountain's defenses for non-payment of its statutory

FETRA assessments are meritless and should be summarily rejected . . . ."  ECF

1    No. 30 at 1.  Whether such discovery is relevant to King Mountain's treaty

2    counterclaim and defense hinges on the standard of review applicable to this case,

3    which the parties dispute.

4         a.    Standard of Review

5         In general, federal and state laws are presumed to apply to Indians absent an

6    exception.  *Ramsey v. United States*, 302 F.3d 1074, 1078 (9th Cir. 2002) (noting

7    that "all citizens, including Indians, are subject to federal taxation unless

8    exempted" and quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49

9    (1973) ("Absent express federal law to the contrary, Indians going beyond

10   reservation boundaries have generally been held subject to nondiscriminatory State

11   law[s]."));  *Cree v. Waterbury*, 78 F.3d 1400, 1403 (9th Cir. 1996) [hereinafter

12   "*Cree I*"] ("State tax laws applied to Indians outside of Indian country, such as

13   those at issue here, are presumed valid '[a]bsent an express federal law to the

14   contrary.'") (quoting *Mescalero*, 411 U.S. at 148-49); *United States v. Baker,* 63

15   F.3d 1478, 1484 (9th Cir. 1995) ("Federal laws of general applicability are

16   presumed to apply with equal force to Indians.").

17        The applicable standard of review varies depending on whether the

18   contested law is state or federal.  If the contested law is a state law, the court

19   presumes that the law is valid as applied to Indians "absent express federal law to

20   the contrary."  *Cree I,* 78 F.3d at 1403 (quoting *Mescalero*, 411 U.S. at 148-49)

1    (internal quotation marks omitted).  "A treaty can constitute such an express

2    federal law."  *Id.*  Whether a treaty exempts an Indian Tribe from a state law

3    depends on the parties' intent when they entered the treaty.  *Id.* at 1404.  In

4    determining the parties' intent, the Court must "examine the Treaty language as a

5    whole, the circumstances surrounding the Treaty, and the conduct of the parties

6    since the Treaty was signed . . . ."  *Id.* at 1405.

7         Additionally, the Treaty "must be interpreted as the Indians would have

8    understood [it]."  *Cree v. Flores*, 157 F.3d 762, 769 (9th Cir. 1998) [hereinafter

9    "*Cree II*"].  If the plain language of the treaty is ambiguous, then the Court

10   considers extrinsic evidence, resolving ambiguities in favor of the Indians.  *King*

11   *Mountain Tobacco Co. v. McKenna*, 768 F.3d 989, 993 (9th Cir. 2014) ("[E]ven

12   though legal ambiguities are resolved to the benefit of the Indians, courts cannot

13   ignore plain language that, viewed in historical context and given a fair appraisal,

14   clearly runs counter to a tribe's later claims.");  *United States v. Smiskin*, 487 F.3d

15   1260, 1264 (9th Cir. 2007) ("The text of a treaty must be construed as the Indians

16   would naturally have understood it at the time of the treaty, with doubtful or

17   ambiguous expressions resolved in the Indians' favor.").

18        In contrast, the federal government has greater power than the states to deal

19   with Indian tribes, and thus "all citizens, including Indians, are subject to federal

20   taxation [under federal law] unless expressly exempted."  *Ramsey*, 302 F.3d at

1078.  Therefore, "[t]he federal standard requires a definite expression of

exemption stated plainly in a statute or treaty before any further inquiry is made or

any canon of interpretation employed." *Ramsey*, 302 F.3d at 1076.  The exemption

language "need not explicitly state that Indians are exempt from the specific tax at

issue; it must only provide evidence of the federal government's intent to exempt

Indians from taxation." *Ramsey*, 302 F.3d at 1078.

      The *Ramsey* court provided several examples of express exemptive

language, including "free from incumbrance," "free from taxation," and "free from

fees." *Ramsey*, 302 F.3d at 1078.  "Only if express exemptive language is found in

the text of the statute or treaty should the court determine if the exemption applies

to the tax at issue." *Id.* at 1079.  The Court then considers whether the exemptive

language could be "reasonably construed" to support the claimed exemption. *Id.* at

1079.  "[A]ny ambiguities as to whether the exemptive language applies to the tax

at issue should be construed in favor of the Indians." *Id.* at 1079.

      FETRA is a federal law.  However, King Mountain contends that the

FETRA assessments are not taxes, but fees, and that, therefore, the state law

standard, rather than the federal standard, applies.  ECF No. 24 at 5-8; ECF No. 26

at 7-10.  The United States argues that, regardless of whether FETRA assessments

are taxes or fees, the Yakama Treaty does not exempt King Mountain from paying

its FETRA assessments.  ECF No. 15 at 15-18; ECF No. ECF No. 14 at 11-14.

King Mountain fails to cite any case law distinguishing a federal tax from a federal fee for purposes of determining which standard to apply to an alleged exemption.  To the contrary, the *Ramsey* court used the terms "fee" and "tax" interchangeably:

> In fact, this Court recognized a distinction between the standard for state *tax* exemptions and federal *tax* exemptions in *Cree I*:  The State argues that the *fees* 'implement federal highway financing policy,' and that consequently the *fees* are valid unless the Treaty creates a 'definitely expressed' exemption.  The State presents no authority for this court to find that the state-imposed truck *fees* should be judged according to the standard for federal *fees*.

*Ramsey*, 302 F.3d at 1078 (emphases added) (quoting *Cree I*, 78 F.3d at 1403 n.4) (internal quotation marks omitted).

King Mountain also fails to cite, nor is the Court aware of, any case law post-*Ramsey* in which this circuit has applied the standard traditionally applied to state laws to a federal law imposing a fee, rather than a tax.  The Ninth Circuit in *McKenna* generalized the two standards as applying either to state laws or to federal laws when it stated that *Ramsey* explained "the differences between the 'express exemptive language' test, which applies to federal laws, and the 'express federal law' test, which applies to state laws."  *McKenna*, 768 F.3d at 994.

Similarly, the Ninth Circuit has applied the state law standard equally to state laws imposing taxes, fees, and other regulatory measures under state law.  *See, e.g., McKenna*, 768 F.3d at 993 (applying state standard to state escrow fee);

*Smiskin*, 487 F.3d at 1264, 1266 (applying state standard to state notice requirement and finding that "there is no basis in either the language of the Treaty or our cases interpreting it for distinguishing restrictions that impose a fee from those, as here, that impose some other requirement."); *Cree II*, 157 F.3d at 769 (applying state standard to state license fees and permit requirements); *Cree I*, 78 F.3d at 1405 (remanding case and directing district court to apply state standard to state license fees and permit requirements).[4]

_____

[4] During oral argument, King Mountain stressed that the distinction between a fee and a tax is relevant for other reasons, including that a fee may be considered an unconstitutional taking, while a tax almost never is, and that a fee constitutes the taking from citizen A to give to citizen B, whereas a tax is placed into a larger pool of funds that may ultimately benefit Citizen A.  However, King Mountain failed to plead in response to the United States' Motion to Dismiss that the FETRA assessments constitute an unconstitutional taking.  King Mountain raises that issue in a Motion for Summary Judgment, which is not yet ripe. *See supra* note 1.

Whether the FETRA assessments solely benefit another citizen or ultimately come back to benefit King Mountain in some way has no independent significance under the terms of the Yakama Treaty.  *See infra* part C.*iii*.b.

Although Ninth Circuit precedent may distinguish between a fee and a tax in other areas of the law, any distinction between fees and taxes is irrelevant when determining which standard applies to the interpretation of the Yakama Treaty in this instance.  FETRA is a federal law, and therefore the federal standard applies. Accordingly, the Yakama Treaty must contain express exemptive language before the Court can consider whether that exemptive language applies to FETRA assessments, or consider extrinsic evidence, such as how the Yakama tribe may have understood the Treaty terms.

b.    Whether Discovery is Relevant Under the Federal Law Standard

King Mountain argues that two Articles of the Yakama Treaty prohibit imposition of FETRA assessments against it:  Article II and Article III.  Article II of the Treaty describes the land that was reserved to the Yakama Nation and states that the "tract shall be set apart and, so far as necessary, surveyed and marked out, *for the exclusive use and benefit* of said confederated tribes and bands of Indians . . . ."  Treaty with the Yakamas, art. II, 12 Stat. 951 (1855) (emphasis added).  King Mountain argues that the language "for the exclusive use and benefit" evidences an intent by the Treaty parties to prevent proceeds from the allotted land accruing to any non-Indian party or government.  ECF No. 24 at 11-12.

King Mountain made the same argument in its action seeking a declaratory judgment that King Mountain was exempt from paying excise taxes on its

ORDER REGARDING VARIOUS MOTIONS ~ 28

1    manufactured tobacco products, *King Mountain Tobacco Co. v. Alcohol and*

2    *Tobacco Tax and Trade Bureau*, 923 F.Supp.2d 1280, 1285-87 (E.D. Wa. 2013)

3    [hereinafter "*King Mountain I*"], and as a defense to the United States' action to

4    recover those unpaid taxes, *King Mountain Tobacco Co. v. Alcohol and Tobacco*

5    *Tax and Trade Bureau*, 996 F.Supp.2d 1061, 1068-70 (E.D. Wa. 2014) [hereinafter

6    "*King Mountain II*"], *appeal docketed*, No. 14-35165 (9th Cir. Mar. 5, 2014).

7        In those cases, this Court determined that to the extent that the "exclusive

8    use and benefit" language constitutes express exemptive language that exemption

9    did not apply to King Mountain's manufacture of tobacco products because of the

10   Ninth Circuit's limiting definition of that language.  *King Mountain I*, 923

11   F.Supp.2d at 1287.  The Court stated:

12       The Ninth Circuit has had an opportunity to construe Article II's
         "exclusive use and benefit" language.  In *Hoptowit v. Comm'r of*
13       *Internal Revenue,* 709 F.2d 564 (9th Cir.1983), an enrolled member of
         the Yakama Nation sought exemptions from federal income tax for
14       income derived from a smoke shop operated on land within the
         Yakama Nation reservation and for per diem payments received for
15       his work on the Yakama Nation Tribal Council.  *Id.* at 565.  He
         asserted that Article II's "exclusive use and benefit" language was the
16       source of the exemption.  *Id.* at 565–66.

17       . . . .  In reviewing the language of Article II, the court noted that
         language "gives to the Tribe the exclusive use and benefit *of the land*
18       on which the reservation is located."  *Id.*  The court concluded that
         "any tax exemption created by this language is limited to the income
19       derived directly from the land."  *Id.*  . . . .

20       This Court already has held that King Mountain does not enjoy an
         exemption from the federal excise tax on tobacco products under

ORDER REGARDING VARIOUS MOTIONS ~ 29

1    *Capoeman* because the tax is not imposed on products directly derived

2    from the land.  Therefore, to the degree that Article II contains express

     exemptive language, the exemption to taxation created by Article II

3    would not apply to the facts of this case.  *Id.*    Accordingly, the

     Plaintiff has failed to establish an exemption to the excise tax under

4    the Treaty.

5    *King Mountain I*, 923 F.Supp.2d at 1285-87.

6        The Court's reasoning in *King Mountain I* compels the same result in this

7    case.  Like the excise taxes in *King Mountain I*, the FETRA assessments were

8    calculated based on the quantity of manufactured cigarettes and roll your own

9    tobacco that King Mountain placed into the market.  King Mountain's market share

10   ultimately determined the amount of King Mountain's FETRA assessments.  The

11   assessments did not apply to raw tobacco derived directly from the land.  Instead,

12   the assessments applied to the manufactured product.  Thus the assessments were

13   not imposed on a product derived directly from the land, but on a manufactured

14   product twice or thrice removed from the land.  The Court concluded that, to the

15   extent that the "exclusive use and benefit" language in Article II constitutes

16   express exemptive language prohibiting the imposition of taxes or fees on income

17   that a tribal member derives directly from the land, that language does not apply to

18   King Mountain's manufactured cigarettes or roll your own tobacco.

19       Because King Mountain's manufactured tobacco products are not derived

20   directly from the land under Ninth Circuit law, no amount of discovery regarding

     the Yakama people's understanding of the treaty can change the result in this case.

ORDER REGARDING VARIOUS MOTIONS ~ 30

1    Thus, discovery on King Mountain's counterclaim and defense regarding Article II

2    of the Treaty is irrelevant and unnecessary.

3         King Mountain also argues that Article III precludes imposition of the

4    FETRA assessments.  Article III states:

5         [I]f necessary for the public convenience, roads may be run
          throughout the said reservation; and on the other hand, the right of
6         way, with free access from the same to the nearest public highway, is
          secured to them; as also the right in common with citizens of the
7         United States, to travel upon all public highways.

8    Treaty with the Yakamas, art. III, 12 Stat. 951.  King Mountain contends that this

9    article guaranteed to the Yakama tribe the right to "take their goods to market free

10   of any fees, tolls, or other impediments."  ECF No. 10 at 4.  King Mountain made

11   this argument in the previous excise tax cases.  *King Mountain I*, 923 F.Supp.2d at

12   1285-87; *King Mountain II*, 996 F.Supp.2d at 1068-70.

13        In those prior cases, this Court determined that the "free access" language in

14   Article III "is not express exemptive language applicable to King Mountain's

15   manufactured tobacco products."  *King Mountain*, 996 F.Supp.2d at 1069.  The

16   Court relied on *Ramsey*, 302 F.3d at 1076-77, and concluded that "Article III

17   provides 'free access' on roads running throughout the reservation to the public

18   highways.  King Mountain is not being taxed for using on-reservation roads," but

19   rather "for manufacturing tobacco products."  *Id.* at 1068-69.  Thus, although the

20   "free access" language may constitute express exemptive language, *see Ramsey*,

302 F.3d at 1080 ("The only exemptive language in the Treaty is the 'free access' language."), that language was not applicable to the excise taxes imposed on King Mountain's manufactured tobacco products.

The same principle applies to this case. The FETRA assessments are imposed against King Mountain as a manufacturer of cigarettes and roll your own tobacco, not as a driver on the roads. Therefore, Article III's "free access" language does not apply to the facts of this case. There is no ambiguity that must be resolved in King Mountain's favor.

King Mountain argues that Article III's language guaranteeing to the Yakama "the right in common with citizens of the United States, to travel upon all public highways" is infringed by the imposition of FETRA assessments. King Mountain relies on *Smiskin* to argue that the right to travel encompasses the right to trade, that a fee on King Mountain's manufactured product violates King Mountain's right to trade, and thus that the fee also violates King Mountain's right to travel under Article III of the Treaty. The United States contends that *Smiskin* is distinguishable and that *McKenna*'s holding that the Yakama Treaty does not guarantee a "right to trade" is controlling.

In *Smiskin*, the Ninth Circuit reviewed a state law requiring individuals intending to transport unstamped cigarettes to give notice to the Washington State Liquor Control Board in advance of the transportation. *Smiskin*, 487 F.3d at 1263.

1    The law did not expressly exempt Yakama tribal members from the pre-

2    notification requirement, and the Smiskins were federally indicted for failing to

3    provide notice. *Id.*  The court considered whether applying the law to Yakama

4    tribal members violated the right to travel under the Yakama Treaty. *Id.* at 1264-

5    70.

6         The *Smiskin* court summarized its prior holding in *Cree II* in which the

7    Ninth Circuit found that Article III of the Yakama Treaty guaranteed to Yakama

8    members "the right to transport goods to market over public highways without

9    payment of fees for that use." *Id.* at 1265 (quoting *Cree II*, 157 F.3d at 769)

10   (internal quotation marks omitted).  The *Smiskin* court also spoke of the "the treaty

11   right to transport goods to market without restriction," ensured by Article III of the

12   Treaty. *Id.* at 1266.  The court rejected the Government's argument that Article

13   III's right to travel should not apply to commercial exchanges:

14        Similarly, we refuse to draw what would amount to an arbitrary line
          between travel and trade in this context, holding, as the Government
15        suggests, that the Yakama Treaty does not protect the 'commerce' at
          issue in the Smiskins' case.  We have already established that the
16        Right to Travel provision 'guarantee[s] the Yakamas the right to
          transport goods to *market*' for '*trade* and other purposes.'  Thus,
17        whether the goods at issue are timber or tobacco products, the right to
          travel overlaps with the right to trade under the Yakama Treaty such
18        that excluding commercial exchanges from its purview would
          effectively abrogate our decision in *Cree II* and render the Right to
19        Travel provision truly impotent.

20

ORDER REGARDING VARIOUS MOTIONS ~ 33

*Id.* at 1266 (quoting *Cree II*, 157 F.3d at 769).  The *Smiskin* court concluded that

the pre-notification requirement operated as a "restriction" and "condition" on the

right to travel and thus violated Article III of the Yakama Treaty.  *Id.*

In *McKenna*, the Ninth Circuit analyzed a state escrow statute requiring

King Mountain to place money into an escrow account to reimburse the State for

health care costs related to the use of tobacco products.  *McKenna*, 768 F.3d at

990.  The amount of money to be placed in escrow was based on "the number of

cigarette sales made that are subject to state cigarette taxes."  *Id.* at 990-91.  The

court considered whether applying the statute to King Mountain violated Article

III's guarantee of the Right to Travel.  *Id.* at 997-98.

King Mountain argued in *McKenna* that the Ninth Circuit's "controlling case

law has interpreted Article III as unequivocally prohibiting imposition of economic

restrictions or pre-conditions on the Yakama people's Treaty right to engage in the

trade of tobacco products."  *Id.* at 997.  The *McKenna* court explicitly rejected that

claim, stating that "[a]s shown by the plain text of Article III, the Treaty reserved

to the Yakama the right 'to travel upon all public highways.'  Nowhere in Article

III is the right to trade discussed."  *Id.*  The court distinguished *Cree II*, noting that

it "involved the right to travel (driving trucks on public roads) for the purpose of

transporting goods to market."  *Id.* at 998.  The court concluded that applying the

1    state's escrow statute to King Mountain did not violate Article III of the Yakama

2    Treaty because "there is no right to trade in the Yakama Treaty." *Id.*

3         The FETRA assessments in this case are more analogous to the required

4    payment into an escrow account, as in *McKenna*, than to the notification

5    requirement held to violate Article III in *Smiskin*.  In *McKenna*, King Mountain

6    was required to pay into Washington's escrow fund because of its status as a

7    tobacco manufacturer that elected not to participate in the Master Settlement

8    Agreement.  *McKenna*, 768 F.3d at 991.  The amount that King Mountain was

9    required to pay into the fund was determined based on "each qualifying unit of

10   tobacco sold" by King Mountain.  *Id.* at 992.  Similarly, the FETRA assessments

11   apply to King Mountain because of King Mountain's status as a manufacturer of

12   tobacco products.  The assessments are imposed on King Mountain in direct

13   proportion to King Mountain's share of the market.

14        Like the escrow payments in *McKenna*, the FETRA assessments do not

15   constitute a "restriction" or "condition" on the use of the public highways.  At

16   most, the FETRA assessments have an indirect impact on King Mountain's trade

17   and sale of tobacco, but that impact is too attenuated from King Mountain's use of

18   the public highways to be in any way related to the right to travel guaranteed by

19   Article III.  The attenuated nature of the FETRA assessments contrasts distinctly

20   with the pre-notification requirement in *Smiskin*, which was only triggered if the

tribal member wished to transport unstamped tobacco products within the state. *Smiskin*, 487 F.3d at 1263.  The FETRA assessments are imposed based on King Mountain's market share, and as the Court noted in *McKenna*, the Yakama Treaty does not guarantee the right to trade unencumbered.  *McKenna*, 768 F.3d at 998.

Additionally, King Mountain's argument that Article III's "in common with" language guaranteeing the Yakama people the right to travel prohibits the imposition of FETRA assessments is refuted by *Ramsey*.  The Ninth Circuit in *Ramsey* considered Article III's provision providing "the right in common with citizens of the United States, to travel upon all public highways," and held that the "in common with" language "contains no exemptive language."  *Ramsey*, 302 F.3d at 1080.  Neither *Smiskin* nor *McKenna* contain a similar holding because both cases concerned state laws, and the court applied the state standard which does not require that the treaty first contain express exemptive language.  The Ninth Circuit has held already that the "in common with" language does not constitute express exemptive language, and this Court is bound by that decision.

Neither Article II nor Article III of the Yakama Treaty contains express exemptive language under the federal standard of review.  Without express exemptive language, the Court may not consider extrinsic evidence regarding how Yakama tribe members understood the Treaty at the time that it was ratified.

1    Therefore, no discovery on King Mountain's Yakama Treaty counterclaim and

2    defense is warranted.  King Mountain's motions for discovery are denied.

3    **D.    Motion to Dismiss**

4          The United States moves to dismiss King Mountain's counterclaim

5    contending that the 1855 Yakama Treaty exempts it from paying FETRA

6    assessments.  ECF No. 14.  The United States argues that King Mountain has failed

7    to state a claim upon which relief may be granted because it did not present a

8    cognizable legal theory.  ECF No. 14.

9          The Federal Rules of Civil Procedure allow for the dismissal of a complaint

10   where the plaintiff fails to state a claim upon which relief can be granted.  Fed. R.

11   Civ. P. 12(b)(6).  A motion to dismiss brought pursuant to this rule "tests the legal

12   sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In

13   reviewing the sufficiency of a complaint, a court accepts all well-pleaded

14   allegations as true and construes those allegations in the light most favorable to the

15   non-moving party.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir.

16   2010) (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-

17   32 (9th Cir. 2008)).

18         To withstand dismissal, a complaint must contain "enough facts to state a

19   claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

20   544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual

1   content that allows the court to draw the reasonable inference that the defendant is

2   liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

3   The question "is 'not whether [the Plaintiff] will ultimately prevail' on his claim,

4   but whether his complaint was sufficient to cross the federal court's threshold."

5   *Skinner v. Switzer*, 562 U.S. 521 (2011) (quoting *Scheuer v. Rhodes*, 416 U.S. 232,

6   236 (1974)).

7       Under *Ramsey*, a statute or treaty must contain express exemptive language

8   in order to exempt a Native American organization from paying a tax or fee.

9   *Ramsey*, 302 F.3d at 1079.  Article II and Article III of the Yakama Treaty do not

10  contain express exemptive language applicable to this case.  Consistent with the

11  Ninth Circuit's holding in *Hoptowit*, the "exclusive use and benefit" language in

12  Article II does not preclude imposition of FETRA assessments on King

13  Mountain's manufactured cigarettes or roll your own tobacco because the

14  manufactured product is not derived directly from the land.  Similarly, consistent

15  with the Ninth Circuit's holding in *Ramsey*, neither the "free access" nor the "in

16  common with" language in Article III precludes imposition of the FETRA

17  assessments because the assessments are levied against King Mountain's

18  manufactured product, not against King Mountain's use of the roads.

19       Neither article exempts King Mountain from paying its FETRA assessments.

20  There is no set of facts which King Mountain could plead that would change this

1  result, and thus King Mountain has failed to plead a cognizable legal theory with

2  regard to its treaty counterclaim.  The United States' motion to dismiss King

3  Mountain's treaty counterclaim is granted.

4  **E.    Motion for Summary Judgment**

5      The United States moves for summary judgment in its favor against King

6  Mountain on its claim to recover unpaid FETRA assessments.  ECF No. 15.  If this

7  case survives King Mountain's motion for summary judgment on its counterclaim

8  that the FETRA assessments violate the Takings Clause, the Court will remand this

9  case to CCC for a hearing and determination regarding the accuracy of the

10  assessment calculations.  Accordingly, the Court denies with leave to renew the

11  United States' motion for summary judgment.

12  **F.    Motion to Strike Jury Demand**

13      The United States moves to strike King Mountain's jury demand.  ECF No.

14  22.  The Supreme Court has held that "the Seventh Amendment right to trial by

15  jury does not apply in actions against the Federal Government."  *Lehman v.*

16  *Nakshian*, 453 U.S. 156, 160 (1981).  However, the "Seventh Amendment

17  guarantees a jury trial to determine liability in a Government action seeking civil

18  penalties."  *United States v. Nordbrock*, 941 F.2d 947, 949 (9th Cir. 1991) (citing

19  *Tull v. United States*, 481 U.S. 412, 418-25 (1987)).  The United States is not

20  seeking penalties in this case, only assessments and accrued interest.  Therefore the

1    Seventh Amendment does not provide a basis to grant King Mountain's request for

2    a jury trial.

3        Section 714b(c) of Title 15 of the United States Code states that "[a]ll suits

4    against the [CCC] shall be tried by the court without a jury."  15 U.S.C. § 714b(c).

5    Additionally, "[a]ny suit by or against the United States as the real party in interest

6    based upon any claim by or against the [CCC]" is subject to § 714b(c).  Therefore,

7    there is no statutory right to a jury trial in this case either.

8        There being no constitutional or statutory basis for a jury trial, the United

9    States' motion to strike the jury demand is granted.

10        Accordingly, **IT IS HEREBY ORDERED**:

11    1.  The United States' Motion for Summary Judgment, **ECF No. 15**, is

12        **DENIED with leave to renew.**

13    2.  The United States' Motion to Dismiss Counterclaim, **ECF No. 14**, is

14        **GRANTED in part.**  King Mountain's **counterclaim** that the 1855

15        Yakama Treaty precludes imposition of FETRA assessments against it is

16        **DISMISSED with PREJUDICE.**  King Mountain's counterclaim that

17        the General Allotment Act precludes imposition of FETRA assessments

18        against it is deemed **WAIVED**.

19

20

3. The United States' Motion to Strike Jury Demand, **ECF No. 22**, is **GRANTED.** King Mountain's **jury demand** is hereby **STRICKEN** from the record.

4. King Mountain's Rule 56(d) Motion in Opposition to United States of America's Motion for Summary Judgment, **ECF No. 23**, is **DENIED.**

5. King Mountain's Motion in Support of Defendant's Essential Right to Conduct Discovery, **ECF No. 25**, is **DENIED.**

6. The United States' Motion to Strike Reply Memorandum, **ECF No. 37**, is **DENIED.**

The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** this 27th day of July 2015.


      *s/ Rosanna Malouf Peterson*
ROSANNA MALOUF PETERSON
Chief United States District Court Judge